UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

GROUP 1 AUTOMOTIVE, INC.,

                Plaintiff,

     - against -

COUNTRY IMPORTED CAR CORP., d/b/a
BMW of the Hamptons and Mini of the Hamptons;
IMPORT REALTY, LTD; MICHAEL A.
CARUSO; VINCENT C. CARUSO; and JOSEPH
T. MARRO,

                Defendants.

-------------------------------------------------------------X

**MEMORANDUM AND ORDER**
07-CV-1454 (RRM)(WDW)

ROSLYNN R. MAUSKOPF, United States District Judge.

       Plaintiff, Group 1 Automotive ("Group 1"), brings this diversity action for breach of contract to recover amounts due pursuant to a series of agreements executed by defendants in contemplation of a sale to plaintiff of defendants' BMW and Mini car dealerships. Plaintiff alleges that defendant Import Realty, Ltd. ("IRL") defaulted on a $2,343,750.00 promissory note executed in connection with the sale, which was guaranteed by defendants Country Imported Car Corp. ("Country"), Michael A. Caruso, Vincent C. Caruso and Joseph T. Marro. Group 1 now moves for summary judgment, seeking repayment of the principal amount of the loan as well as amounts in interest and late fees to which it asserts it is entitled. Defendants have cross-moved for summary judgment. For the reasons set forth below, plaintiff's motion for summary judgment is GRANTED and defendants' motion is DENIED.

# BACKGROUND[1]

## I. The Asset Purchase Agreement and the Amended and Restated Asset Purchase Agreement

Plaintiff is an owner and operator of automotive dealerships in the United States and the United Kingdom. (Pl. 56.1 Stmt. (Doc. No. 73-2) at ¶ 1.) During the relevant time period, defendant Country owned and operated BMW, Mini and Mercedes Benz dealerships at 35 Montauk Highway and 749, 759 and 769 County Road 39A in Southampton, New York. (Exhibit D to Aff. of Michael Caruso (Doc. No. 74-16) at 1.) Specifically, the Mercedes dealership was located at 759 County Road, the BMW dealership was located at 35 Montauk Highway and the Mini dealership was located at 749 County Road. The 35 Montauk Highway facility also housed Country's parts sales and service facilities for all brands. Defendant IRL owned the real property upon which Country operated the dealerships. (Pl. 56.1 Stmt. (Doc. No. 73-2) at ¶ 1.) The individual defendants were officers of Country and IRL. (*Id.*)

---

[1] The following material facts are taken from the Local Rule 56.1 Statements submitted by the parties and the affidavits and exhibits submitted in connection with the parties' summary judgment motions and oppositions thereto. The facts are undisputed except as noted. Moreover, unless otherwise noted, citations to the parties' Rule 56.1 Statements concern factual assertions that are admitted or are deemed admitted because they were not contradicted by citations to admissible evidence. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").

Contravening both Local Rule 56.1 and this Court's Individual Rule III.B.3, defendants' Rule 56.1 counterstatement fails to quote verbatim plaintiff's 56.1 Statement and respond to each allegation set forth therein. Instead, defendants set forth paragraphs that differ from plaintiff's 56.1 Statement, in both number and content, and then purport to respond with admissions or denials. Curiously, defendants' counterstatement contains both a signature and signature block from plaintiff's counsel, appearing as though the counterstatement was submitted by opposing counsel. It is also captioned "Plaintiff Group 1 Automotive, Inc.'s Rule 56.1 Statement," and is undated. In addition to the aforementioned deficiencies, all paragraphs of defendants' Rule 56.1 counterstatement fail specifically to controvert the content of plaintiff's Rule 56.1 Statement. (*Compare, e.g.,* Pl. 56.1 Stmt ¶¶ 1–10, *with* Def. 56.1 Cntrstmt. ¶¶ 1–17; *see also* Local Civ. R. 56.1(c) (providing that a Statement's material facts "will be deemed to be admitted for purposes of the motion unless *specifically controverted*") (emphasis added).) Ordinarily, failure to comply with the Local Rules regarding Rule 56.1 Statements would result in the material facts in the non-complying party's Statement being deemed admitted for the purposes of deciding the pending summary judgment motion. A district court, however, "has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001); *see also Rateau v. City of N.Y.*, No. 06–CV–4751 (KAM)(CLP), 2009 U.S. Dist. LEXIS 90112, at *2 (E.D.N.Y. Sept. 29, 2009) (exercising discretion in reviewing the admissible record evidence in determining whether proposed undisputed facts were disputed). Accordingly, defendants' statement of undisputed facts is treated as undisputed only where it is not controverted by admissible evidence in the record.

In August 2005, Group 1 and Country entered into an Asset Purchase Agreement, which provided for Group 1's acquisition of Country's BMW and Mini dealerships. (*Id.* at ¶ 2.) The agreement also provided for a restructuring of Country's BMW, Mini and Mercedes facilities to gain BMW North America's required approval for the transfer of the dealerships from Country to Group 1. (*Id.*) However, BMW North America did not approve the terms of the Asset Purchase Agreement. (*Id.* at ¶ 3.) Consequently, on December 20, 2005, Group 1 and Country entered into an Amended and Restated Asset Purchase Agreement (the "Amended Agreement"). (*Id.*) Like the Asset Purchase Agreement before it, Paragraph 10.9 of the Amended Agreement provided that it could not be amended without a signed writing. (Exhibit D to Aff. of Michael A. Caruso (Doc. No. 74-16) at 17.)

The Amended Agreement addressed the requirement that the BMW and Mini showrooms meet BMW North America's standards. (Def. Mem. (Doc. No. 74-3) at 1.) To that end, Country was required to purchase a new contiguous parcel of land at 51 Montauk Highway and build a new Mini showroom thereon. (Affidavit of Michael A. Caruso (Doc. No. 74-12) at ¶ 7.) Country was also required to relocate all of its Mercedes Benz operations from 35 Montauk Highway to 749 County Road. (*Id.*) The land and facilities at 35 and 51 Montauk Highway would in turn be leased to Group 1 for the operation of BMW and Mini dealerships by IRL at the closing of the Amended Agreement. (Def. Mem. (Doc. No. 74-3) at 1.) The Amended Agreement required that all land purchases, construction and relocation of the Mercedes parts sales and service operations be completed by September 30, 2006. (Exhibit D to Aff. of Michael A. Caruso (Doc. No. 74-16) at 8.) In conjunction with the Amended Agreement, the parties executed several ancillary agreements. Group 1 and IRL both executed a Construction Loan Agreement and a Promissory Note and the individual defendants and Country executed a Loan

3

Guaranty promising to pay any amount for which IRL became liable if it defaulted on the Promissory Note. (Pl. 56.1 Stmt. (Doc. No. 73-2) at ¶ 4.)

The Construction Loan Agreement required Group 1 to loan money to IRL for IRL's use in building the Mini showroom at 51 Montauk Highway and completing other improvements to property listed on Exhibit B thereof. (Exhibit D to Aff. of William D. Wallach, Esq. (Doc. No. 73-7).) It also conditioned Group 1's obligation to loan money on receipt of an executed Promissory Note and Guaranty. (*Id.*) The agreement set forth a September 30, 2006 date for "completion of construction of the improvements and issuance of all licenses and permits necessary for occupancy, use or sale thereof." (*Id.* at ¶ 1.10.) The agreement provided that IRL would be in default if, *inter alia*, any party defaulted under the terms of either the Promissory Note, the Guaranty or the Amended Agreement. (*Id.* at ¶¶ 8.1, 8.2, 8.12.) Group 1's remedies for default enabled it to declare the Promissory Note immediately due and payable. (*Id.* at ¶ 9.2.) Finally, the Construction Loan Agreement provided that it could not be amended or modified absent a writing signed by all of the parties. (*Id.* at ¶ 12.4.)

The Promissory Note required IRL to repay the money disbursed under the Construction Loan Agreement by September 30, 2006, and specified that IRL would default if it failed to timely make any required payment. (Exhibit F to Aff. of William D. Wallach, Esq. (Doc. No. 73-9).)[2] The Promissory Note referenced the Construction Loan Agreement and noted that it evidenced a loan being made under the Construction Loan Agreement. (*Id.*) It provided that IRL would be in default if, *inter alia*, it failed to make any payment required thereunder, or if it

---

[2] The Promissory Note included several provisions obligating IRL to pay to plaintiff interest and late fees in the event of default: (1) interest at a rate of 7% retroactive to the start of the loan; (2) a 6% late charge on the balance due if payment was not made within 10 days of default; and (3) at plaintiff's option, an increase to 18% per year on the outstanding principal of the loan, calculated from the date of default, until all amounts payable under the Note were paid in full. (*Id.* at ¶ 7.) Additionally, the Promissory Note provided for attorney's fees and costs expended by plaintiff to collect the debt. (Exhibit F to Aff. of William D. Wallach, Esq. (Doc. No. 73-9) at ¶ 9.)

breached the Construction Loan Agreement. (*Id.* at ¶ 6.) The Promissory Note enabled Group 1 to declare all obligations thereunder due and payable immediately if IRL was in default. (*Id.*) Importantly, it also contained a provision whereby IRL waived the right to any notice of non-payment and "notice of every kind." (*Id.* at ¶ 9.) The Promissory Note did not contain any provision prohibiting amendment thereto in the absence of a writing.

The Guaranty required Country and the individual defendants to answer for the amount due by IRL under the Promissory Note. (Exhibit E to Aff. of William D. Wallach, Esq. (Doc. No. 73-8) at ¶ 1.) Country and the individual defendants' obligation to pay under the Guaranty arose upon Group 1's demand. (*Id.*) The Guaranty contained a waiver of Country and the individual defendants' rights to "demands for performance, notices of nonperformance . . . and all other notices or demands to which [Country and the individual defendants] might otherwise be entitled." (*Id.* at ¶ 4.) The Guaranty also contained a clause prohibiting modification or amendment in the absence of a writing signed by all parties thereto. (*Id.* at ¶ 13.) Finally, it provided that Country and the individual defendants were jointly and severally liable for their obligations thereunder. (*Id.* at ¶ 14.)

Pursuant to the Construction Loan Agreement, plaintiff advanced $2,343,750.00 to IRL to fund the acquisition of land and facilitate the construction of the new facilities. (*Id.* at ¶ 5; Def. Mem. (Doc. No. 74-3) at 2.) Additionally, plaintiff deposited $500,000.00 in earnest money into an escrow account pursuant to the terms of the Amended Agreement. (Pl. 56.1 Stmt. (Doc. No. 73-2) at ¶ 10.) The Amended Agreement provided that Group 1 would forfeit the earnest money if the purchase and sale of the dealerships failed to close for a reason other than Country's breach of the Amended Agreement. (Exhibit C to Aff. of William D. Wallach, Esq. (Doc. No. 73-16) 1.)

## II. Negotiations for Amendments to the Amended Agreement, Construction Loan, Promissory Note and Guaranty

Plaintiff did not receive any payment from IRL as required under the terms of the Promissory Note on or before September 30, 2006, or at any other time. (*See* Aff. of Lance A. Parker (Doc. No. 73-11) ¶ 3.) Additionally, Country and IRL failed to complete construction of the Mini showroom by September 30, 2006, as required by Paragraph 4.1.2 of the Amended Agreement. As discussed more fully below, the parties began a dialogue, exploring possible modifications of the deadlines and contractual obligations.

On October 5, 2006, plaintiff's counsel sent an e-mail to defendants' counsel[3] indicating that amendments to the Amended Agreement "to reflect the new structure" of the transaction would be forwarded to defendants "shortly." (Exhibit X to Aff. of Raymond A. Peck, Esq. (Doc. No. 74-4).) The discussions focused, *inter alia*, on a new deadline of November 30, 2006 for payment of the Promissory Note and performance under the Construction Loan Agreement, (Exhibit G to Aff. of Michael A. Caruso (Doc. No. 74-19)), and for Group 1 to assume control of construction of the new Mini showroom at 51 Montauk Highway (Exhibit L to Michael A. Caruso (Doc. No. 74-24)).

On October 18, 2006, plaintiff forwarded an e-mail to BMW North America indicating that it could not close the transaction until December 2006. (Exhibit J to Aff. Of Michael A. Caruso (Doc. No. 74-22).) On October 19, 2006, plaintiff signed letters of intent with BMW North America and its Mini Division that altered, in handwriting, the closing date for the Amended Agreement to December 31, 2006. (Exhibits H & I to Aff. Of Michael A. Caruso (Doc. Nos. 74-20, 74-21).) The letters of intent provided that BMW North America had conditionally approved Group 1's purchase of Country's dealerships and was prepared to enter

---

[3] Country, IRL and the individual defendants as guarantors were all represented by Raymond Peck for all transactions discussed herein. (Aff. of Raymond A. Peck, Esq. (Doc. No. 74-3).)

into a "Car Center Agreement" and an "SAV Center Agreement" with Group 1's subsidiary, NY-SBII, Inc., upon completion of certain conditions. (Exhibit H to Aff. Of Michael A. Caruso (Doc. No. 74-20).) The conditions included the requirement that facilities for the sale of BMW and Mini vehicles meet the requirements set forth in BMW North America's "Center Operating Requirements Addendum." (*Id.*)

On October 20, 2006, while negotiations on proposed draft written amendments to the Amended Agreement and ancillary documents were underway, Group 1's counsel e-mailed defendants' counsel and advised that Country and IRL were "in default under the loan agreement and asset purchase" because they had not met "all of [their] deliverables . . . on schedule." (Exhibit H to Aff. of William D. Wallach, Esq. (Doc. No. 75-3).) The same day an internal e-mail exchange at Group 1 reflected some apprehension among its management about the transaction. For example, one email suggested that although at least one officer did not want Group 1 to purchase the dealerships, other Group 1 officers perceived the deal as presenting some risk, which was outweighed by the overall benefits. (Exhibit N to Aff. of Michael A. Caruso (Doc. No. 74-26).) Another suggested that while Group 1 wanted to move forward with the deal, it did not want to end up paying for certain environmental issues that Country was obligated to address. (Exhibit O to Aff. of Michael A. Caruso (Doc. No. 74-27).)

Five days later, on October 25, 2006, Group 1's counsel forwarded defendants' counsel a set of draft amendments to the Amended Agreement. (Exhibit Z to Aff. of Raymond A. Peck, Esq. (Doc. No. 74-6).) Attached to the email were drafts of several documents: a draft "First Amendment to Amended and Restated Asset Purchase Agreement" with new lease agreements attached thereto ("Draft First Amendment"), a draft "First Amendment to Promissory Note," a draft "First Amendment to [Construction] Loan Agreement," and an "Agreement to Sell and

Purchase related to Group 1's purchase of the [51 Montauk Highway] property." (*Id.*) The Draft First Amendment to Amended and Restated Asset Purchase Agreement would provide for Group 1 to purchase, as opposed to lease, the facility at 51 Montauk Highway from IRL and enter a short-term lease for the 749 County Road facility. (Exhibit G to Aff. of Michael A. Caruso (Doc. No. 74-19) at ¶ 3.) In addition, the Mini showroom would remain at 749 County Road until completion of the new Mini facility at 51 Montauk Highway. (*Id.*) Also, defendants claim that "[a]s a further condition of the First Amendment," Country would move the Mercedes parts and service facilities to a building at 630 Hampton Road by November 30, 2006. (Aff of Raymond A. Peck, Esq. (Doc. No. 74-3) at ¶ 3(C)).[4]

Notably, the amendments to the Promissory Note and Construction Loan Agreements also extended until November 30, 2006, IRL's obligation to pay the Promissory Note and Country's obligations to relocate the Mercedes parts sales and service operations. (*See id.*) The draft First Amendment was four pages long, contained unsigned signature blocks, included a draft line in at least one attached document, and left a blank space for the date of a referenced agreement. (*Id.* at ¶ 3.) Its terms wholly reference specific paragraphs in the Amended Agreement and either deletes them or adds new language thereto. (*Id.*) A header on the "Agreement to Sell and Purchase" the land at 51 Montauk Highway attached to the draft First Amendment indicated that the document was a draft. (Exhibit G to Aff. of Michael A. Caruso (Doc. No. 74-19) at D-000216 ("Draft #1 October 24, 2006").)

On November 2, 2006, Group 1 had an internal e-mail exchange noting that Group 1 had asked one of the individual defendants for an employee list. (Exhibit L to Aff. of Michael A. Caruso (Doc. No. 74-24).) On November 6, 2006, plaintiff and Country exchanged e-mails

---

[4] Despite defendants' contention that a move of the Mercedes operations to 630 Hampton Road was somehow part of the negotiations, that specific address is not memorialized in any of the draft amendments.

wherein Michael Caruso mentioned going forward with "the timely transfer of our BMW and MINI stores and interests to you by the end of the month." (Exhibit AA to Aff. of Raymond A. Peck, Esq. (Doc. No. 74-7).) On November 15, 2006, plaintiff sent defendants' counsel an e-mail asking for items from the diligence checklist that plaintiff had submitted to defendants. (Exhibit R to Aff. of Michael A. Caruso (Doc. No. 74-30).) On November 16, 2008, Michael Caruso sent plaintiff another e-mail providing plaintiff with additional information concerning schedules to the Amended Agreement that Group 1 had sought in an earlier communication. (Exhibit S to Aff. of Michael A. Caruso (Doc. No. 74-31).)

On November 17, 2006, plaintiff's counsel wrote to defendants' counsel that while Country and IRL had defaulted on the terms of both the Amended and Loan Agreements, plaintiff wished to continue "working with [Country] to move forward on this transaction," but that, *inter alia*, if Country and IRL did not complete all improvements required by the Amended Agreement and deliver a certificate of occupancy for the Mini showroom at 51 Montauk Highway by November 30, 2006, Group 1 would "declare a default under the [Promissory Note] and terminate the [Amended Agreement]." (Exhibit Q to Aff. of Raymond A. Peck, Esq. (Doc. No. 74-11).) Also on November 17, Michael Caruso sent Group 1 an email stating that Group 1 had mentioned that closing of the Amended Agreement might not conclude on November 30, 2006. (Exhibit S to Aff. of Michael A. Caruso (Doc. No. 74-31).) Caruso asserted that Country had recently received Group 1's recent request for diligence, but noted that it could be turned quickly. (*Id.*) Caruso asked what date closing could occur on. (*Id.*)

On November 22, 2006, Country sent plaintiff a response to due diligence inquiries plaintiff had made regarding Country's business, which referenced terms of the ongoing negotiations, including Group 1's purchase of the 51 Montauk Highway property and a short-

term lease of 749 County Road by Group 1 to continue Mini sales until the 51 Montauk Highway construction was complete. (Exhibit BB to Aff. of Raymond A. Peck, Esq. (Doc. No. 74-8).) On November 28, 2006, defendants' counsel sent plaintiff another e-mail to discuss "[a] couple of items still outstanding" in the negotiation of the Draft First Amendment to the Amended Agreement, such as the purchase price for the 51 Montauk Highway land, the description of land to be leased at 35 Montauk Highway and the rent amount for that property. (Exhibit DD to Aff. of Raymond A. Peck, Esq. (Doc. No. 74-10).)

On November 27, 2006, unbeknownst to defendants, plaintiff began an internal discussion about potential concerns that unionized employees at Country's dealerships might attempt to unionize plaintiff's other Long Island dealerships. (Exhibit T to Aff. of Michael A. Caruso (Doc. No. 74-32).) On November 28, 2006, Group 1's CEO, in an internal e-mail, stated that "I only learned of the Union issue last night. That is a game breaker." (Exhibit J to Aff. of William D. Wallach, Esq. (Doc. No. 75-4).) Thus, on November 28, Group 1 sent around another internal e-mail stating that it would terminate the Amended Agreement. (Exhibit W to Aff. of Michael A. Caruso (Doc. No. 74-35).)

Thereafter, on December 1, 2006, plaintiff's counsel sent defendants' counsel a letter stating that plaintiff was unwilling to waive Country and IRL's September 30, 2006 default on the "Purchase Agreement and Loan Agreement" and asserting that "Country failed to take the necessary actions to allow the parties to meet the commitment to BMW." (Exhibit V to Aff. of Michael A. Caruso (Doc. No. 74-34).) Specifically, Group 1 explained that "[t]he letter of intent with BMW [to operate exclusive sales and service facilities for BMW and Mini] expires December 31, 2006. The transaction will not be ready to close prior to the expiration of Group 1's letter of intent from BMW." (*Id.*) Additionally, the letter accused Country of attempting to

10

increase its profits on the transaction at the cost of timely meeting deadlines. (*Id.*) The letter stated that Group 1's counsel had "sent a notice of default to [defendants' counsel] on October 20, 2006" and "[a] subsequent notice of default on November 17, 2006." (*Id.*) The letter declared the Promissory Note immediately due and payable, including the amounts for interest and late fees triggered by default. (*Id.*)

### III. The Parties' Claims

On April 6, 2007, plaintiff commenced this action seeking damages for breach of contract on the Promissory Note, Construction Loan Agreement and Guaranty. (Exhibit B to Aff. of Michael A. Caruso (Doc. No. 74-14).) Plaintiff asserts that defendants are liable for breach of the Promissory Note because: (1) it advanced IRL funds under the Promissory Note; and (2) IRL never repaid the funds by the maturity date of September 30, 2006. (Pl. Mem. (Doc. No. 73-3) at 6-7.) Plaintiff also seeks "relief against all [d]efendants for their collective failure to repay the monies advanced by [Gourp 1] as required by the Construction Loan Agreement, the Promissory Note, and the Loan Guaranty." (*Id.* at 6.) The plaintiff argues that "[t]here can be no dispute that the Guarantors were given notice of [] IRL's breach of the Promissory Note, but still failed and refused to make payment to [Group 1]." (*Id.*) Finally, plaintiff claims it is entitled to judgment against IRL for breach of the Construction Loan agreement because Paragraph 8.1 thereof provides for default thereunder if any party breached, *inter alia*, the Promissory Note. (*Id.*)[5]

Plaintiff claims it was owed a total of $6,203,834 as of December 21, 2010, and that IRL and the other defendants are liable for all sums due and owing pursuant to the Promissory Note

---

[5] While a breach of the Construction Loan Agreement entitled plaintiff to declare the amount IRL owed it under the Promissory Note due and owing, the Construction Loan Agreement itself does not provide for recovery of any damages. Therefore, to the extent that plaintiff is entitled to all of the relief it seeks under the Promissory Note and Guaranty because those agreements contain their own independent provisions for default, discussion of a breach of the Construction Loan Agreement is not necessary.

and Loan Guaranty. (*See* Exhibit B to Aff. of Michael A. Caruso (Doc. No. 74-14) at 5-8; Pl. 56.1 Stmt. (Doc. No. 73-2) at ¶¶ 8-9.) The total amount plaintiff claims is comprised of $2,343,750.00 for the loan balance, interest at a rate of 7% retroactive to the start date of the loan under the Promissory Note, a late charge of 6% of the amount of the overdue payment under the Promissory Note provided that the Promissory Note was not paid within ten days of the due date and increased interest on the outstanding principal of the loan in the amount of 18% per year under the Promissory Note calculated from the date of default. (Pl. Mem. (Doc. No. 73-3) at 4-5.) Plaintiff also requests that the Court order release of the $500,000.00 it paid into escrow in earnest money, arguing that the deal failed to close because of Country's breach. (Pl. Mem. (Doc. No. 73-3) at 10.)

Defendants counterclaim for breach of what they claim was a "Type I preliminary agreement" based on the negotiations for Country and IRL to complete performance under the Amended Agreement and ancillary documents later than September 30, 2006. (Def. Mem. (Doc. No. 74-3) at 4.) Defendants claim that the damages they sustained because of Group 1's alleged breach exceed the damages defendants would owe, if any, under the Promissory Note. (*Id.*) Likewise, defendants oppose plaintiff's motion on the basis that the purported Type I preliminary agreement extinguished any obligations Country was required to fulfill under the Amended Agreement. Alternatively, defendants argue that the parties entered into a "Type II preliminary agreement," which does not entitle defendants to damages for breach, but which obligated Group 1 to continue negotiating in good faith. Finally, defendants claim that they are entitled to retain the $500,000.00 in earnest money because Group 1 breached the "purchase and sale agreement." (*Id.*)

Presently before the Court are the parties' cross-motions for summary judgment.

12

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a summary judgment motion, a district court must draw all reasonable inferences in favor of the non-moving party. *See id.* at 249 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998). Thus, the court must not "weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2007) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Any evidence in the record of any material fact from which an inference could be drawn in favor of the non-moving party precludes summary judgment. *See Castle Rock Entm't*, 150 F.3d at 137.

Once the movant has demonstrated that no genuine issue of material fact exists, such that it is entitled to judgment as a matter of law, then "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). However, there must exist more than mere "metaphysical doubt as to the material facts" to defeat a summary judgment motion. *Id.* at 58. Instead, the non-moving party must present "concrete evidence

from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Only disputes over material facts "that might affect the outcome of the suit under the governing law" will properly preclude the entry of summary judgment. *Id.* at 248; *see also Matsushita*, 475 U.S. at 586.

## DISCUSSION

Plaintiff alleges that IRL violated Section 6(a) of the Promissory Note by failing to repay the amount it borrowed pursuant to the Construction Loan Agreement on September 30, 2006. Plaintiff also asserts that Country and the individual defendants are liable pursuant to the Guaranty, for the principal amount it advanced to IRL and the various interest and late fees provided for in the Promissory Note because IRL defaulted on the Promissory Note. Plaintiff also claims that Country breached the Amended Agreement by, *inter alia*, failing to provide plaintiff with a title insurance commitment, and is thus not entitled to retain the earnest money.

Defendants concede that IRL failed to pay the loan back pursuant to the Promissory Note and that Country and the individual defendants are liable under the guaranty. However, defendants argue that as a result of the parties' discussions beginning in approximately early October 2006 through November 30, 2006, a third agreement, which they claim modified the Amended Agreement, and constituted a binding Type I preliminary agreement that defendants allege plaintiff breached. Alternatively, defendants argue that negotiations for a third agreement attained the status of a Type II preliminary agreement, and obligated plaintiff to continue negotiating the remaining open terms in good faith. Defendants do not specify the relief to which they would be entitled under a Type II agreement, aside from a vague assertion of "damages suffered by Country." (Def. Mem. (Doc. No. 74-2) at 10 n.7.) Finally, defendants

14

argue that the Amended Agreement was never terminated by plaintiff and that plaintiff waived IRL's default. Each issue is discussed in turn below.

## IV.   Breach of Contract

### a.  Plaintiff's Claim

To establish a breach of contract under New York law,[6] a plaintiff must establish: (1) the existence of a contract; (2) adequate performance by the plaintiff; (3) breach of the contract by defendant; and (4) damages. *Eternity Global Master Fund, Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 177 (2d Cir. 2004). Under New York law, to establish a *prima facie* case of default on a promissory note, a plaintiff must provide proof of the valid note and of defendant's failure, despite proper demand, to make payment. *Export-Import Bank of U.S. v. Agricola Del Mar BCS*, 536 F. Supp. 2d 345, 349 (S.D.N.Y. 2008).

A guaranty creates an obligation to answer for the debt of another. *Midland Steel Warehouse Corp. v. Godinger Silver Art Ltd.*, 276 A.D.2d 341, 343 (1st Dept. 2000). In order to prevail on a claim for breach of written guaranty, the plaintiff must show "an absolute and unconditional guaranty, the underlying debt, and the guarantor's failure to perform under the guaranty." *City of New York v. Clarose Cinema Corp.*, 256 A.D.2d 69, 71 (1st Dept. 1998). Guarantors are secondarily liable, and thus the principal debtor must default on his or her obligation before a breach of guaranty can occur. *Brewster Transit Mix Corp v. McLean*, 169 A.D.2d 1036, 1037 (3d Dept. 1991).

New York law provides that "[w]hen a written contract, as here, provides that it can be modified only by a signed writing, an oral modification of that agreement is not enforceable

---

[6] Although the parties do not explicitly state that New York law applies to this dispute, all relevant agreements provided by the parties in support of these cross-motions have a New York choice of law provision. (Exhibit B to Aff. of William D. Wallach, Esq. (Doc. No. 73-5) at 15.); (Exhibit D to Aff. Of Michael A. Caruso (Doc. No. 74-16) at 17); (Exhibit G to Aff. Of Michael A. Caruso (Doc. No. 74-19) at 4.) Therefore, the Court finds that New York law applies to this dispute.

unless the oral modification is fully executed or there has been a partial performance 'unequivocally referable' to the oral modification." *F. Garofalo Elec. Co. v. New York Univ.*, 270 A.D.2d 76, 80 (1st Dept. 2000)). "A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent." N.Y. GEN. OBLIG. LAW § 15-301(1) (2010).

Under New York law, whether a binding agreement exists is a legal issue, not a factual one. *Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir. 1996); *Ronan Assocs., Inc. v. Local 94–94A–94B, Int'l Union of Operating Eng'rs*, 24 F.3d 447, 449 (2d Cir. 1994). "[W]here 'the evidentiary foundation for determining the formation of the parties' contract [is] either undisputed or consist[s] of writings,' contract formation is . . . a question of law." *Vacold LLC v. Cerami*, 545 F.3d 114, 123 (2d Cir. 2008) (quoting *TLT Constr. Corp. v. RI, Inc.*, 484 F.3d 130, 135 (1st Cir. 2007) (alterations in original)). This case does not present factual disputes about what particular communications were sent or what particular words were uttered; none of the facts are disputed, and nothing remains for a jury to resolve. The sole question is the legal significance of those facts.

Here, plaintiff has established all four elements of a contract claim for the Promissory Note. First, plaintiff has shown the existence of a contract executed by Group 1 and IRL – the Promissory Note. (Pl. 56.1 Stmt. (Doc. No. 73-2) at ¶ 4.) Second, plaintiff performed adequately; it was required to disburse a sum of money under the Promissory Note and did so. (*Id.* at ¶ 5.) Third, IRL breached the terms of the Promissory Note by failing to pay the amount due thereunder by September 30, 2006, despite Group 1's demand for payment on December 1,

2006. (*See* Aff. of Lance A. Parker (Doc. No. 73-11) at ¶ 3.) Indeed, defendants admit that "plaintiff has demonstrated that [IRL] technically 'defaulted' by not paying the loan upon its 'maturity date.'" (Def. Mem. (Doc. No. 74-3) at 9.) Fourth, plaintiff has established damages in that it is entitled to repayment of the principal sum loaned under the Construction Loan, as well as all of the other fees provided for in the Promissory Note. (Pl. 56.1 Stmt. (Doc. No. 73-2) at ¶ 7.)

With regard to the Guaranty, plaintiff has demonstrated that Group 1 and Country and the individual defendants executed the agreement, which establishes an absolute and unconditional guaranty. (Exhibit E to Aff. of William D. Wallach, Esq. (Doc. No. 73-8).) Next, plaintiff has established the underlying debt by showing that Group 1 disbursed $2,343,750.00 to IRL under the Promissory Note. (Aff. of Lance A. Parker (Doc. No. 73-11).) Additionally, plaintiff has shown that IRL defaulted under the Promissory Note. *Brewster Transit Mix* Corp, 169 A.D.2d at 1037. Finally, plaintiff alleges in its complaint that it made a demand for payment under the Guaranty to Country and the individual defendants. (Compl. (Doc. No. 1) at ¶ 38.) However, defendants denied that such a demand was made in their answer. (Answer & Counterclaim (Doc. No. 4) at ¶ 38.) Nevertheless, because defendants admit that "plaintiff is entitled to partial summary judgment as to liability only to recover on [the guaranty obligations of Country and the individual defendants]," (Def. Mem. (Doc. No. 74-3) at 9), the Court finds it unnecessary to deny plaintiff summary judgment for failing to submit evidence that it made a demand on Country and the individual defendants under the Guaranty. Therefore, defendants are liable to plaintiff for damages for IRL's breach of the Promissory Note and under the Guaranty.

Also, plaintiff has established that, pursuant to the Amended Agreement, Country may only retain the $500,000.00 in earnest money if the dealership purchase and sale failed to close

for a reason other than Country's breach.[7] As explained *supra*, Michael Caruso admitted at a deposition that Country failed to meet its obligations under the Amended Agreement by not providing Group 1 with a certificate of occupancy for the new Mini showroom at 51 Montauk Highway, failing to comply with a provision regarding environmental concerns and not providing a title insurance commitment for 35 Montauk Highway. (Exhibit G to Aff. of William D. Wallach, Esq. (Doc. No. 73-10) at 86-94.) Therefore, in light of Country's breach of the terms of the Amended Agreement, if defendants fail to establish a new contract that extinguished the Amended Agreement, or that plaintiff waived the default, plaintiff is entitled to return of the earnest money.

### b. Defendants' Contentions and Counterclaims

Defendants counterclaim for breach of contract against plaintiff. At the outset of their memorandum of law, defendants claim that "Group 1 repudiated and breached" what they claim was a binding set of obligations arising out of the parties' negotiations starting in October 2006. Defendants assert that "the damages [Country] suffered from this breach exceed[] the amount sought by Group 1." (Def. Mem. (Doc. No. 74-3) at 4.) However, defendants then argue that the case presents disputed issues of fact with regard the existence of a preliminary agreement and the amount of damages. (*Id.* at 9.) For the reasons set forth below, the uncontroverted evidence establishes that no binding obligations were reached that relieved any of the defendants of their obligations under the Amended Agreement, the Promissory Note, the Construction Loan Agreement or the Guaranty.

---

[7] The earnest money provision states that: "[contingent upon the satisfaction of several conditions precedent] the Earnest Money shall be paid to [Country] if the transaction contemplated by this Agreement does not close for any reason other than [Country's] breach." (Exhibit C to Aff. of William D. Wallach, Esq. (Doc. No. 73-6) at 1.) Defendants have not established that the transaction failed to close for a reason other than their breach.

Moreover, defendants concede that defendants have not sought to prove damages, an indispensable element of a contract claim. (Def. Mem. (Doc. No. 74-3) at 9 ("the amount of Import's underlying liability based on plaintiff's breach of the Asset Purchase Agreement [sic] (as modified by the First Amendment) has not been established").) Thus, even if defendants could establish the other three elements of a contract claim they are not entitled to summary judgment because they cannot establish the fourth element.

## V. Alleged Modifications to the Amended Agreement

Defendants' argue that the parties negotiated and reached an oral modification of the terms of the Amended Agreement, and other ancillary documents. This claim is foreclosed by the plain terms of the Amended Agreement. Where a contract provides a procedure for amending contract provisions, that procedure must be followed to execute a valid amendment. *See, e.g.*, *Deutsche Bank AG v. JPMorgan Chase Bank*, 2007 WL 2823129, at *23–24 (S.D.N.Y. Sept. 27, 2007), *aff'd*, 331 Fed. Appx. 39 (2d Cir. 2009) (where contract provides that no amendment is valid "unless in writing and signed" by certain required parties, the absence of such signatures invalidated a purported amendment); *John St. Leasehold LLC v. F.D.I.C.*, 196 F.3d 379, 382 (2d Cir. 1999) (New York law enforces contractual requirements that amendments be in writing and signed by the parties). Paragraph 10.9 of the Amended Agreement states that "[t]his Agreement may not be amended by any oral agreement or understanding but only by an amendment in writing executed by the parties hereto." (Exhibit D to Aff. of Michael A. Caruso (Doc. No. 74-16) at 17.) Consequently, the parties could not modify the Amended Agreement without complying with this provision. *John St. Leasehold LLC*, 196 F.3d at 382.

Indeed, the uncontroverted record establishes that the negotiations with plaintiff following defendants' September 30, 2006 default on the Promissory Note specifically

contemplated reducing to writing any and all changes to the terms of the Amended Agreement and ancillary agreements in new, formal, written agreements. The parties circulated various draft documents, all of which are titled as "amendments" to the corresponding existing documents. (Exhibit Z to Aff. Of Raymond A. Peck, Esq. (Doc. No. 74-6).) As defendants concede in their own affidavits supporting this motion, in discussions regarding the forthcoming writings reflecting these new terms, Group 1 referred to the documents as "amendments to the Amended and Restated Asset Purchase Agreement, Promissory Note [and] Construction Loan Agreement." (Exhibit X to Aff. of Raymond A. Peck, Esq. (Doc. No. 74-4).) Moreover, even as late as November 27, 2006, defendants themselves referred to the proposed terms of the Draft First Amendment as the "proposed amended APA." (Exhibit CC to Aff. of Raymond A. Peck, Esq. (Doc. No. 74-9).) Thus, the uncontroverted evidence, including that proffered by defendants themselves, demonstrates that the new terms being discussed among the parties were merely proposals being negotiated to modify the existing Amended Agreement and Construction Loan Agreement, the terms of which required changes to be in writing. Further, the uncontroverted record establishes that no such writings were executed. As such, the terms of the Amended Agreement and Construction Loan were never altered.[8] This alone is sufficient to find for plaintiff.

## VI.     Type I and Type II Preliminary Agreements

Defendants next argue that the parties consummated either a binding "Type I" or "Type II" preliminary agreement, which extinguished the parties' obligations under the Amended Agreement and its ancillary documents and established new obligations on the contracting parties. This claim is without merit.

---

[8] For the reasons set forth below more fully in the discussion of whether defendants have shown a Type I preliminary agreement, defendants also have not shown that the parties altered the Promissory Note.

New York law recognizes Type I and Type II preliminary agreements as "a class of agreements . . . [that] provide for the execution of more formal agreements." "[I]f a preliminary agreement clearly manifests such intention, it can create binding obligations." *Shann*, 84 F.3d at 77; *see also Vacold*, 545 F.3d at 123-24 ("Ordinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract . . . . In some circumstances, however, preliminary agreements can create binding obligations.").

"[B]inding preliminary agreements fall into one of two categories." *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998). The first are Type I preliminary agreements – "fully binding preliminary agreement[s], which [are] created when the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document." *Id.*; *see also Shann*, 84 F.3d at 77 ("Type I is where all essential terms have been agreed upon in the preliminary contract, no disputed issues are perceived to remain, and a further contract is envisioned primarily to satisfy formalities."). Agreements of this type render the parties "fully bound to carry out the terms of the agreement even if the formal instrument is never executed." *Adjustrite*, 145 F.3d at 548. When considering whether an agreement is a Type I preliminary agreement, a court must analyze: (i) "whether there is an expressed reservation of the right not to be bound in the absence of a writing; (ii) whether there has been partial performance of the contract; (iii) whether all of the terms of the alleged contract have been agreed upon; and (iv) whether the agreement at issue is the type of contract that is usually committed to writing." *Brown v. Cara*, 420 F.3d 148, 154 (2d Cir. 2005). Notably, "prime significance attaches to the intentions of the parties and to

their manifestations of intent." *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 497 (S.D.N.Y. 1987).

Agreements within the second category are considered Type II preliminary agreements – "Type II is where the parties recognize the existence of open terms, even major ones, but, having agreed on certain important terms, agree to bind themselves to negotiate in good faith to work out the terms remaining open." *Shann*, 84 F.3d at 77. "'binding preliminary commitment[s]'" that are "binding only to a certain degree" because "the parties agree on certain major terms, but leave other terms open for further negotiation." *Tribune Co.*, 670 F. Supp. at 497. These agreements "do[ ] not commit the parties to their ultimate contractual objective." *Adjustrite*, 145 F.3d at 548 (citation and internal quotation mark omitted). Rather, they bind the parties "to the obligation to negotiate the open issues in good faith in an attempt to reach the . . . objective within the agreed framework." *Id.* If the parties "fail to reach such a final agreement after making a good faith effort to do so, there is no further obligation." *Id.* When considering whether an agreement is a Type II preliminary agreement, a court must analyze: (i) "whether the intent to be bound is revealed by the language of the agreement"; (ii) "the context of the negotiations"; (iii) "the existence of open terms"; (iv) "partial performance"; and (v) "the necessity of putting the agreement in final form, as indicated by the customary form of such transactions." *Brown*, 420 F.3d at 157.

The uncontroverted facts here establish neither type of binding agreement.

Alternatively, defendants argue that a Type II agreement bound the parties to continue negotiating in good faith to resolve "the union problem," and that plaintiff is liable for damages for breaching that obligation. (Def. Mem. (Doc. No. 74-3) at 10 n.7). On the uncontroverted evidence, neither type of agreement was reached here.

22

### a. Type I Preliminary Agreement

The first factor in analyzing whether the parties entered into a Type I preliminary agreement is "whether there is an expressed reservation of the right not to be bound in the absence of a writing." *Brown*, 420 F.3d at 154. First, as discussed above, the parties agreed, by the terms of both the Amended Agreement and Construction Loan, not to be bound to any amendments thereto without an executed writing. Second, as also discussed above, the negotiations between the parties after September 2006 contemplated amendments to the Amended Agreement, Construction Loan and Promissory Note, as opposed to an entirely new agreement. Those amendments were memorialized in a set of draft writings specifically geared toward provisions of the Amended Agreement, Construction Loan Agreement and Promissory Note. (*See, e.g.*, Exhibit G to Aff. of Michael A. Caruso (Doc. No. 74-19); Exhibit X to Peck Decl. (Doc. No. 74-4).) Therefore, the Court finds that this factor weighs heavily against the existence of a Type I agreement.

The second factor is whether there has been partial performance of the contract. *Brown*, 420 F.3d at 154. Defendants purport to have performed several obligations arising from the negotiations to amend the Amended Agreement: (1) the lease of a new facility at 630 Hampton Road for the parts and service operations of the Mercedes Benz dealership; (2) acquisition and installation of shop equipment at the 630 Hampton Road facility and renovation thereto; (3) securing Mercedes Benz's approval to relocate the Mercedes business to the new locations; (4) "taking all steps required to vacate the premises at 35 Montauk Highway;" (5) allowing plaintiff to install training equipment at 35 Montauk Highway and send its personnel there to train BMW technicians regarding plaintiff's operating procedures; and (6) "preparing such site for tenancy by plaintiff for its new BMW showroom and BMW and Mini Parts and service facilities." (Def.

Mem. (Doc. No. 74-3) at 11-12.) However, all of the actions defendants assert were performed pursuant to an alleged third agreement were obligations it was required to perform under the Amended Agreement. Paragraph 3.12 of the Amended Agreement required defendants to "relocate the Mercedes parts sales and service facility." (Exhibit D to Aff. Of Michael A. Caruso (Doc. No. 74-16) at 7.) The actions defendants cite were actions necessary to relocate the Mercedes parts sales and service facility.

Moreover, defendants have unconvincingly attempted to transform one action – moving out of the facility at 35 Montauk Highway – into six separate actions. The Amended Agreement required Country to remove the Mercedes parts and service operations from 35 Montauk Highway, necessarily requiring it obtain some other space in which to place those operations. The First Amendment did not change that obligation by requiring Country to move into a specific address.

Furthermore, nothing in the draft of the First Amendment provided by defendants as an exhibit in support of their cross-motion specifically requires Country to, for example, acquire and install substantial shop equipment. (*See generally,* Exhibit G to Aff. Of Michael A. Caruso (Doc. No. 74-19).) On the other hand, the First Amendment contemplated that IRL would execute a lease with plaintiff for the premises at 749 County Road. (*Id.* at 2.) Indeed, defendants do not allege that the lease had been executed. Therefore, the Court finds that this factor also weighs against the existence of a Type I agreement.

The Court must next consider whether all of the terms of the alleged contract have been agreed upon. *Brown,* 420 F.3d at 154. "[T]he existence of open terms creates a presumption against finding a binding contract as to the ultimate goal." *Id* at 158. Defendants assert, with no support, that the parties' discussions left "no material terms which remained to be negotiated."

(Def. Mem. (Doc. No. 74-3) at 11.) However, the uncontroverted record, including documents submitted by defendants themselves, demonstrates that all terms had not been agreed upon. For example, the parties had yet to agree on some of the lease terms for 749 County Road, (*see* Exhibit CC to Aff. of Raymond A. Peck, Esq. (Doc. No. 74-9) ("[a]s to the two exhibits, they are the proposed leases . . . which [defendant] and [plaintiff] are still discussing.")), as well as the purchase price for 51 Montauk Highway by Group 1. (*See* Exhibit DD to Aff. of Raymond A. Peck, Esq. (Doc. No. 74-10) (noting that the parties had yet to agree upon whether the purchase price would reflect a credit for $13,555.62 in rent and whether the interest provision in the sale price constituted interest accrued on the construction loan).) Therefore, the Court finds that this factor also weighs against the existence of a Type I agreement.

The final factor is whether the agreement at issue is the type of contract that is usually committed to writing. *Brown*, 420 F.3d at 154. Though that fact is not dispositive, the fourth factor "would better be put in terms of whether in the relevant business community, it is customary to accord binding force to the type of informal or preliminary agreement at issue." *Teachers*, 670 F. Supp. at 503. In considering this factor, the Court may look to the complexity of the transaction at issue. *See Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 83 (2d Cir. 1985). In *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262-63 (2d Cir. 1984), the court found that where a transaction involved the sale of six entities for $4 million, "the magnitude and complexity of the deal as reflected in the numerous written contract drafts not only reinforce the parties' stated intent not to be bound until written contracts were signed, but also reflect a practical business need to record all the parties' commitments in definitive documents." With regard to transactions involving the sale of real property, New York's statute of frauds requires such agreements to be in writing. N.Y. Gen Oblig. Law § 5-703(2).

The type of agreement at issue in this case is a set of unexecuted amendments to a comprehensive set of agreements, some of which contained clauses that barred amendment without a signed writing. The deal was complex in that it required not only the restructuring of three existing auto dealerships, but also the execution of several ancillary documents to enable loans, construction of facilities, improvements to land and leases of two properties. The proposed amendments arising from the negotiations in October 2006 were no less complex, as they reflected changes to, *inter alia*, which land would be sold and leased. Finally, all agreements between the parties had been in writing from the beginning of the parties' relationship, and the proposed amendments were all memorialized in draft writings. Therefore, the Court concludes that this factor does not weigh in favor of defendants.

In sum, none of the factors weigh in favor of finding a Type I preliminary agreement between the parties. The parties clearly did not intend to be bound without a signed writing, the contract was not partially performed, some terms were left open and the contract was of a type usually committed to writing. Therefore, the uncontroverted evidence cannot support defendants' claim that the parties are bound to a Type I agreement.[9]

### b. Type II Preliminary Agreement

Alternatively, defendants claim that the parties reached a Type II agreement. Some of the factors in assessing a Type II preliminary agreement analysis overlap with the Type I analysis – the existence of open terms, partial performance and whether such agreements are normally put

---

[9] Defendants also claim that a new contract was created by "novation." Under New York law, four elements are necessary for a novation: "(1) a previously valid obligation; (2) agreement of all parties to a new contract; (3) extinguishment of the old contract; and (4) a valid new contract." *Healey v. Healey*, 594 N.Y.S.2d 90, 91 (3d Dep't 1993); *see also May Dep't Stores Co. v. International Leasing Corp.*, 1 F.3d 138, 140 (2d Cir. 1993) (defining novation under New York law as "an agreement for an existing obligation to be extinguished immediately by the acceptance of a new promise."). As discussed in connection with the Type I analysis, the parties did not agree to a new contract, and the obligations under the old were not extinguished. Thus, there could not have been a novation of the Amended Agreement

in writing – and the Type I analysis applies equally here. The additional Type II factors are discussed below.

The first factor – whether the intent to be bound is revealed by the language of the agreement – is clear here. As discussed above, the original Asset Purchase Agreement, as well as the Amended Agreement and Construction Loan, expressed the parties' intent to be bound only by a signed writing. Moreover, that the parties memorialized the proposed new terms under negotiation in a draft writing negates any contention that the parties sought to reach an unwritten or oral agreement. Nothing in the draft documents that would have modified the Amended Agreement, Construction Loan or Promissory Note evinced an intent to be bound without a signed writing. *See Brown,* 420 F.3d at 157.

The second factor is the context of the negotiations. *Id.* While defendants have sought to characterize the negotiations as an ongoing effort to close the purchase and sale of the dealerships as set forth in the Amended Agreement, (Def. Mem. (Doc. No. 74-3) at 11), this is belied by the record evidence, particularly the timely notices of default plaintiff provided defendants on October 20, 2006, and again on November 17, 2006. The facts demonstrate that Country and IRL had breached their obligations under the Amended Agreement and the Promissory Note respectively as Country had not delivered to Group 1 a certificate of occupancy for the new Mini showroom by September 30, 2006, and IRL had not repaid the amount due under the Promissory Note on the same day. The first communication from Group 1 to defendant' counsel concerning the Country and IRL's defaults on the Amended Agreement and Construction Loan expressed Group 1's hope that Country could "start hitting the marks" and that Country needed to "review all of [their] deliverables and make sure [they were] on schedule." (Exhibit H to Aff. of William D. Wallach, Esq. (Doc. No. 75-3).) On November 17,

2006, Group 1 gave Country until November 30, 2006, to provide a certificate of occupancy for the new Mini showroom, deliver a title insurance commitment and address outstanding environmental concerns. (Exhibit Q to Aff. of Michael A. Caruso (Doc. No. 74-29).) While the emails exchanged between September 30, 2006, and December 1, 2006, discuss the possibility of proposed modification to the Amended Agreement, Construction Loan and Promissory Note and reflect the preparation of drafts thereof, Group 1 never indicated that it intended to waive Country's and IRL's respective breaches of the Amended Agreement and Promissory Note. Thus, the context of the negotiations reveals a seller and borrower that defaulted under their respective contracts, and a buyer and lender that was willing to forbear from exercising its remedies, but nevertheless fully reserved the right to exercise those remedies under all agreements. Therefore, the Court finds that the parties did not enter a Type II preliminary agreement.

## VII. Waiver

Finally, defendants argue that, even if no modified agreements were consummated, plaintiff waived its right to claim a breach of the Promissory Note through its conduct in "allowing defendants to continue to perform, by executing documents such as the letters of intent with BMW and Mini" and otherwise negotiating the terms of a modified agreement. (Def. Mem. (Doc. No. 74-3) at 7-8.) While a breach of contract may be waived by the non-breaching party, such waiver must be proved to be intentional. *Beth Israel Medical Center v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 585 (2d Cir. 2006). Waiver requires proof of a "clear manifestation of an intent by plaintiff to relinquish her known right" and "mere silence, oversight or thoughtlessness in failing to object" to a breach of the contract will not support a finding of waiver. *Courtney-Clarke v. Rizzoli Intern. Publications, Inc.*, 676 N.Y.S.2d 529 (1st

28

Dep't 1998); *see also Beth Israel*, 448 F.3d at 585 ("Oversight, carelessness, or thoughtlessness will not create a waiver. There must appear to be an intention to relinquish the right or advantage, and it must be proved.").

Moreover, "there is no warrant for the position that a party to a contract waives his rights under the contract by failing to insist upon performance at the due date and by urging and encouraging the other party to perform thereafter." *Filmline (Cross-Country) Productions, Inc. v. United Artists Corp.*, 865 F.2d 513, 518 (2d Cir. 1989); *see also Seven-Up Bottling Co. (Bangkok), Ltd. v. PepsiCo, Inc.*, 686 F. Supp. 1015, 1023 (S.D.N.Y. 1988) ("A party's reluctance to terminate a contract upon a breach and its attempts to encourage the breaching party to adhere to its obligations under the contract do not necessarily constitute a waiver of the innocent party's rights in the future").

The case at bar does not present an ambiguous set of facts with regard to plaintiff's intent to waive defendants' default on the Promissory Note. Twice following defendants' default on the Promissory Note, plaintiff made clear to defendants that they were in default. In the November 17, 2006, letter, plaintiff set forth the consequences of the default, including the various interest and late fees for which defendants were liable. (Exhibit I to Aff. of William D. Wallach, Esq. (Doc. No. 75-4).) Although plaintiff here attempted to help Country and IRL cure their defaults under the Amended Agreement and Promissory Note, those efforts do not go so far as to constitute a waiver of plaintiff's rights under those agreements. Plaintiff listed the actions defendants needed to take in order to cure the default, and stated unequivocally that if defendants did not comply by November 30, 2006, plaintiff would declare a default and terminate the Amended Agreement. (*Id.*) Certainly, plaintiff's communications with defendants regarding the

default on the Promissory Note do not evince an intent to waive the default. Therefore, the Court finds that plaintiff did not waive defendants' breach.

**VIII. Damages**

Because the uncontroverted evidence demonstrates that IRL breached the Promissory Note and Country and the individual defendants are liable under the Guaranty, and that the parties did not enter into any subsequent binding obligation that would have relieved defendants under their original obligations, the plaintiff has established that it is entitled to all amounts due pursuant to the Promissory Note. Plaintiff is entitled to the following damages in the total amount of $6,203,834.00 under the Promissory Note, representing the amounts as follows: (1) $2,343,750.00 for the loan balance, (2) $177,534.00 as a late fee, (3) $1,136,923.00 in interest, and (4) $2,545,627.00 in penalty interest.

Plaintiff also is entitled to an order directing the release of the $500,000.00 it paid into escrow in earnest money, arguing that the deal failed to close because of Country's breach. (Pl. Mem. (Doc. No. 73-3) at 10.) The Amended Agreement provided that Country and IRL were required to meet several conditions prior to closing, such as relocation of the Mercedes parts and service facility. (Exhibit C to Aff. of William D. Wallach, Esq. (Doc. No. 73-6) at 8-9.) Defendant Michael Caruso admitted at a deposition that some of the conditions were not met. (Exhibit G to Aff. of William D. Wallach, Esq. (Doc. No. 73-10) at 86-94.) Specifically, Caruso admitted that Country had not provided a certificate of occupancy for the new Mini showroom at 51 Montauk Highway, complied with a provision regarding environmental concerns or provided a title insurance commitment for 35 Montauk Highway. (Pl. Mem. (Doc. No. 73-3) at 8-10.)

## CONCLUSION

Accordingly, plaintiff's motion for summary judgment (Doc. No. 73) is GRANTED, and judgment shall enter in favor of Group 1 and as against Country, IRL and the individual defendants jointly and severally in the total amount of $6,203,834.00, representing the following: Plaintiff is further entitled to release the $500,000 in earnest money from escrow. Defendants' cross-motion for summary judgment (Doc. No. 74) is DENIED. The Clerk of Court is directed to enter judgment accordingly and close the file.

SO ORDERED.

Dated: Brooklyn, New York
August 15, 2012

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge